No. 23-2512

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

DEMONA FREEMAN,

*Plaintiff-Appellant,*

v.

OCWEN LOAN SERVICING, LLC AND BANK OF NEW YORK MELLON,
AS TRUSTEE FOR C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES,

*Defendants-Appellees*

On Appeal from the United States District Court
for the Southern District of Indiana
No. 1:8-cv-03844
Hon. Tonya Walton Pratt, District Judge

### *AMICI CURIAE* BRIEF IN SUPPORT OF PETITION FOR REHEARING *EN BANC*

John G. Albanese
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594.5999
Fax: (612) 584.4470
Email: jalbanese@bm.net

[Save As] [Clear Form]

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2512

Short Caption: Demona Freeman v. Ocwen Loan Servicing, LLC and Bank of New York Mellon, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
National Consumer Law Center, National Association of Consumer Advocates

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Berger Montague PC

(3) If the party, amicus or intervenor is a corporation:

　i) Identify all its parent corporations, if any; and
　　Not applicable

　ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
　　Not applicable

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
Not applicable

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
Not applicable

Attorney's Signature: /s/John G. Albanese　　Date: 8/16/2024

Attorney's Printed Name: John G. Albanese

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　Yes [✓]　No [ ]

Address: Berger Montague PC, 1229 Tyler Street NE, Suite 205, Minneapolis MN 55413

Phone Number: 612-594-5997　　Fax Number: 612-584-4470

E-Mail Address: jalbanese@bm.net

rev. 12/19 AK

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ................................................. i

TABLE OF AUTHORITIES ............................................................................... iii

INTEREST OF *AMICI CURIAE* ......................................................................... 1

STATEMENT OF COMPLIANCE WITH RULE 29 ............................................... 2

INTRODUCTION & SUMMARY OF ARGUMENT ............................................... 2

ARGUMENT ...................................................................................................... 2

    I.    CREDIT REPORTS ARE RIDDLED WITH DIFFICULT-TO-CORRECT INACCURACIES .................................................................................. 2

    II.   DISSEMINATION OF INACCURATE INFORMATION TO A THIRD PARTY IS SUFFICIENT FOR ARTICLE III STANDING ......................... 6

CONCLUSION .................................................................................................. 9

CERTIFICATE OF COMPLIANCE .................................................................... 12

CERTIFICATE OF SERVICE ............................................................................ 13

# TABLE OF AUTHORITIES

**Cases**

*Chuluunbat v. Experian Info. Sols., Inc.*, 4 F.4th 562 (7th Cir. 2021) ........... 8

*Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d Cir. 2010) ........... 3

*Crabill v. Trans Union, L.L.C.*, 259 F.3d 662 (7th Cir. 2001) ........... 3

*Evans v. Portfolio Recovery Assocs., LLC*, 889 F.3d 337 (7th Cir. 2018) ........... 5, 6

*Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146 (7th Cir. 2022) ........... 5, 6, 7, 8

*Marchisio v. Carrington Mortg. Servs., LLC,* 919 F.3d 1288 (11th Cir. 2019) ........... 5

*Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184 (7th Cir. 2021) ........... 7

*Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996) ........... 3

*Toliver v. Experian Info. Sols., Inc.*, 973 F. Supp. 2d 707 (S.D. Tex. 2013) ........... 5

*TransUnion, LLC v. Ramirez,* 594 U.S. 413 (2021) ........... 6, 7, 8, 9

**Rules & Statutes**

Article III, U.S. Constitution ........... 2, 6, 7, 8, 9

15 U.S.C. § 1681, *et seq.* ........... 4, 5, 7

15 U.S.C. § 1692, *et seq.* ........... 2, 5, 8

**Other Authority**

Restatement (Second) of Torts § 577 ........... 8

Consumer Financial Protection Bureau, Consumer Response Annual Report (Mar. 2024) https://files.consumerfinance.gov/f/documents/cfpb_cr-annual-report_2023-03.pdf ........... 4

Consumer Financial Protection Bureau, "If I dispute a debt, how does that show up on my credit report?" https://www.consumerfinance.gov/ask-cfpb/if-i-dispute-a-debt-how-does-that-show-up-on-my-credit-report-en-1363/ (November 7, 2023) ........... 5

Fed. Trade Comm'n & Fed. Reserve Bd., Report to Congress on the Fair Credit Reporting Act Dispute Resolution Process 22 (2006) ........... 5

Federal Trade Comm'n Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003 (Dec. 2012) ................................................. 4

National Consumer Law Center, Automated Injustice Redux (2019) https://www.nclc.org/wp-content/uploads/2022/08/automated-injustice-redux-1.pdf ................................................................................................................. 4, 5

# INTEREST OF *AMICI CURIAE*

*Amici Curiae* are the National Consumer Law Center ("NCLC") and the National Association of Consumer Advocates ("NACA"). *Amici* file this brief in support of Plaintiff-Appellant's Petition for Rehearing *En Banc* (the "Petition").

NCLC is a non-profit research and advocacy organization that works for consumer justice and economic security for low-income and other disadvantaged people in the United States. NCLC is recognized nationally as an expert on the Fair Credit Reporting Act ("FCRA") and the Fair Debt Collection Practices Act ("FDPCA"), and has drawn on this expertise to provide legal research, policy analysis, training, and expert witness services to federal and state legislatures, administrative agencies, and courts for over 50 years. NCLC publishes the *Consumer Law Practice Series*, consisting of twenty-one treatises. *Fair Credit Reporting* (10th ed. 2022) and *Fair Debt Collection* (10th ed. 2022) are the definitive treatises on the FCRA and the FDCPA, respectively. The U.S. Supreme Court has cited NCLC's treatises with approval.

NACA is a non-profit association of attorneys and consumer advocates committed to representing consumers' interests. NACA members are private and public sector attorneys, legal services attorneys, law professors, and law students whose primary focus is protecting consumers. NACA's mission is to promote justice for all consumers by maintaining a forum for communication, networking, and information sharing among consumer advocates, particularly regarding legal issues,

1

and by serving as a voice for its members and consumers in the ongoing struggle to curb unfair or abusive practices affecting consumers.

### STATEMENT OF COMPLIANCE WITH RULE 29

No party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money to fund the preparation or submission of this brief; and no other person except the *Amici*, their members, or their counsel contributed money intended to fund the preparation or submission of this brief.

### INTRODUCTION AND SUMMARY OF ARGUMENT

The Panel found that Ms. Freeman lacked Article III standing to bring her FDCPA claim because she had not presented evidence that a creditor "read" and "understood the defamatory significance" of Ocwen's credit reporting that falsely stated her mortgage was in default. (Slip Op. at 9-11.) The Panel reached this conclusion even though the inaccurate information was disseminated to two potential creditors and others. (*Id.* at 11.) This conclusion represents a clear misapplication of binding authority regarding Article III standing, as well as a fundamental misunderstanding of the credit reporting industry. To correct these errors, Plaintiff-Appellant's Petition should be granted.

### ARGUMENT

I. **CREDIT REPORTS ARE RIDDLED WITH DIFFICULT-TO-CORRECT INACCURACIES**

Credit reporting in the United States is dominated by the "Big 3" credit bureaus: Experian, Equifax, and TransUnion. The Big 3 gather information (including items like loan amounts and payment histories) from "furnishers," like

Ocwen. The Big 3 compile such information on consumers in credit reports, which they sell to potential creditors, as well as others that have a unique interest in a consumer's credit history (e.g., employers, insurers).

When a creditor purchases a credit report, they almost always buy an accompanying credit score from companies like the Fair Isaac Corporation ("FICO"). While the precise credit scoring models are trade secrets, FICO's models take into account (among other considerations) amounts owed, payment history, and credit mix.[1] Late payments can "severely harm" a credit score as payment history generally accounts for 35% of a credit score.[2] Creditors often determine whether to provide, continue to provide, or extend credit to consumers based on the credit score alone.[3] Thus, creditors themselves often cannot say definitively what particular pieces of credit information caused a credit denial.[4]

---

[1] FICO, What's in my FICO scores?, https://www.myfico.com/credit-education/whats-in-your-credit-score (last visited August 15, 2024).
[2] Experian, Do Mortgages Have a Grace Period?, https://www.experian.com/blogs/ask-experian/do-mortgages-have-grace-period/ (June 17, 2023).
[3] Investopedia, FICO vs. Experian vs. Equifax: What's the Difference? (Feb. 13, 2023) https://www.investopedia.com/articles/credit-loans-mortgages/082816/fico-vs-experian-vs-equifax-their-pros-and-cons-fico efx.asp#:~:text=1%20Some%20lenders%20make%20credit,those%20major%20credit%20bureaus%20work ("Many lenders, particularly in the mortgage industry, maintain hard-and-fast FICO minimums for approval.").
[4] Courts have recognized this reliance on credit scores in deciding on the standard required to prove that an inaccuracy in a credit report caused damages. "[D]ecisions to deny credit will frequently have more than one cause." *Philbin v. Trans Union Corp.*, 101 F.3d 957, 969 (3d Cir. 1996) (*abrogated on other grounds*, *Cortez v. Trans Union, LLC*, 617 F.3d 688, 721 n.39 (3d Cir. 2010)) (citations omitted). "For example, in some instances [an] inaccurate entry and another factor may each, considered separately, be insufficient to have caused the denial of credit but when taken together are sufficient." *Id.* Because a specific inaccurate entry in a consumer's credit report will rarely be the sole, or "but-for," cause of a consumer's harm, . . . courts have never required such a showing. Instead, they have held that . . . a plaintiff need only establish a "causal relation between the violation of the statute and the loss of credit, or some other harm." *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001).

Unfortunately, credit reports are riddled with inaccuracies. A Federal Trade Commission study found that 1 in 20 have errors so serious that they would be denied credit or receive less favorable terms.[5] In 2023, the Consumer Financial Protection Bureau ("CFPB") received nearly 1.1 million credit reporting complaints, which accounted for 81% of the complaints that the CFPB sent to companies that year.[6]

Inaccurate credit reports harm not only consumers, but also creditors. Potential creditors may wrongly deny people credit based on inaccurate credit reporting, thus depriving the creditor of a business opportunity based on bad information. Indeed, the harms identified by Congress as its purpose in passing the FCRA included that "[i]naccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." 15 U.S.C. § 1681.

Under the FCRA, consumers have the right to dispute inaccurate information and have it investigated and corrected. 15 U.S.C. §§ 1681i(a); 1681s-2(b). But because handling credit disputes by consumers is a cost center for both the credit bureaus and the furnishers of information, the dispute process is broken.[7] Often, furnishers perform mere data conformity reviews to ensure what is being sent to the credit

---

[5] Federal Trade Comm'n Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003 (Dec. 2012).
[6] CFPB, Consumer Response Annual Report (Mar. 2024) https://files.consumerfinance.gov/f/documents/cfpb_cr-annual-report_2023-03.pdf.
[7] *See generally* National Consumer Law Center, Automated Injustice Redux (2019) (hereinafter, "Automated Injustice"), available at https://www.nclc.org/wp-content/uploads/2022/08/automated-injustice-redux-1.pdf.

bureaus matches the data in the furnishers' system. *See Marchisio v. Carrington Mortg. Servs., LLC,* 919 F.3d 1288, 1302 (11th Cir. 2019) (finding review process where creditor merely checked their own database to be unreasonable). If the furnisher does not change its reporting, the credit bureau will all too often parrot back the results from the furnisher with no further investigation. *See Automated Injustice*, at 13-22.

While the FCRA provides some protections for consumers affected by adverse credit reporting, the FDCPA also plays a vital role. If a consumer disputes a debt, the debt collector must report the debt as disputed to the credit bureaus, which mitigates, even if just while further investigation ensues, the damage caused to their credit score. 15 U.S.C. § 1692e(8). That is because the dispute notation on the tradeline affects a credit score.[8] *See Toliver v. Experian Info. Sols., Inc.*, 973 F. Supp. 2d 707, 711–712 (S.D. Tex. 2013) ("[w]hen the dispute notations were removed, however, Toliver's credit score declined significantly . . . [w]hen the dispute notation was added back, her credit score increased significantly."). However, creditors often fail to note the dispute as required. *See Evans v. Portfolio Recovery Assocs., LLC*, 889 F.3d 337, 342 (7th Cir. 2018), *abrogated in part, Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1152 (7th Cir. 2022). As this Court has noted, "[p]ut simply, the failure to inform a

---

[8] Consumer Financial Protection Bureau, "If I dispute a debt, how does that show up on my credit report?" https://www.consumerfinance.gov/ask-cfpb/if-i-dispute-a-debt-how-does-that-show-up-on-my-credit-report-en-1363/ (November 7, 2023); Fed. Trade Comm'n & Fed. Reserve Bd., Report to Congress on the Fair Credit Reporting Act Dispute Resolution Process 22 n.139 (2006) (citing email from Fair Isaac stating that its scoring models do take into consideration that item is subject to dispute that is being investigated), available at https://www.federalreserve.gov/boarddocs/rptcongress/fcradispute/fcradispute200608.pdf.

5

credit reporting agency that the debtor disputed his or her debt will always have influence on the debtor, as this information will be used to determine the debtor's credit score." *Evans*, 889 F.3d at 349.

In situations where a consumer cannot mitigate or obtain a fix to inaccuracies contained in their credit report through the dispute process, filing suit is a consumer's only hope for relief. Yet, the Panel's decision would make it significantly harder for consumers to obtain redress for inaccuracies and further disincentivizes compliance. Under the Panel's decision, consumers with plainly inaccurate and derogatory information in their credit reports will need to prove that their creditors understood that a delinquent mortgage account was adverse to their credit. This newly created standard will create an unnecessary, burdensome, and expensive evidentiary requirement to establish the obvious fact that a creditor's false statement that a consumer is delinquent or in default on their mortgage will always negatively impact a consumer's ability to participate in the credit market. Further, as explained below, this requirement is contrary to Article III standing precedent.

## II. DISSEMINATION OF INACCURATE INFORMATION TO A THIRD PARTY IS SUFFICIENT FOR ARTICLE III STANDING

The relevant inquiry for Article III intangible injuries "asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *TransUnion, LLC v. Ramirez,* 594 U.S. 413, 424 (2021). As this Court has explained, the question is whether "the plaintiff's alleged injury bears a 'close relationship' to the sort of harms traditionally recognized by American courts, such as reputational harm." *Ewing*, 24 F.4th at 1151. Crucially, although this "close-relationship inquiry

looks for 'a close historical or common-law analogue,'" it "does not require an 'exact duplicate.'" *Id.* (quoting *Ramirez*, 594 U.S. at 424). Thus, the Court need not consider whether each of the essential elements of that analog have been proven. *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1192, n.3 (7th Cir. 2021).[9] Instead, the Court's role is narrow: "once [the court] identif[ies] a tort analog, [its] role ends." *Id.*

In *Ramirez*, the Supreme Court held that proof of dissemination of inaccurate information contained in a credit report to a third party is sufficient for Article III standing to recover damages at trial. There, the plaintiff class sought damages under the FCRA after TransUnion inaccurately identified them as "potential matches" to entries on the U.S. Treasury Department's "Specially Designated Nationals" list. *Ramirez*, 594 U.S. at 419-420. In its standing analysis, the Court considered two subgroups of the plaintiff class: (i) 1,853 class members whose inaccurate credit reports TransUnion had disseminated to potential creditors, and (ii) 6,332 class members whose credit files containing the inaccurate information had *not* been disseminated to third parties. *Id.* at 432-33.

---

[9] Footnote 3 from *Persinger* provides:

> At oral argument, Southwest's counsel urged us to apply the elements of intrusion upon seclusion, arguing that Persinger's injury falls short of being highly offensive to a reasonable person—one of the tort's elements. Oral Argument at 11:30–12:43. Counsel was correct about intrusion upon seclusion's elements, see Restatement (Second) of Torts § 652B, but under Ramirez, we do not look for an "exact duplicate," we look for a "close relationship." *Ramirez*, 141 S. Ct. at 2209. In *Ramirez*, the Supreme Court referenced defamation's "essential" element of publication not to apply, in full, the elements of defamation, but to explain why defamation failed as an analogy for those plaintiffs whose inaccurate information had not been shared. See id. at 2209–10. In sum, once we identify a tort analog, our role ends.

*Id.*

The Court reasoned that the latter subgroup lacked standing because they could not establish anything analogous to the element of "publication," which "is 'essential to liability' in a suit for defamation." *Id.* at 434 (quoting Restatement (Second) of Torts § 577, cmt. a). On the other hand, the Court had "no trouble concluding" that the first subgroup "suffered a concrete harm that qualifies as an injury in fact." *Id.* at 432. In sum, the Court explicitly drew the line at dissemination: so long as there was proof that a class member's inaccurate credit report had been disseminated to a third party, the class member had suffered a concrete harm.

Evidence of third party dissemination was also enough for this Court in *Ewing*. In *Ewing*, this Court held that because "the harm Congress sought to remedy" through the FDCPA provision at issue was "analogous to the harm caused by defamation," the defendants' dissemination of false information about the plaintiffs to TransUnion caused a concrete harm that was sufficient to confer standing. *Ewing*, 24 F.4th at 1153; *see also Chuluunbat v. Experian Info. Sols., Inc.*, 4 F.4th 562, 567 n.3 (7th Cir. 2021) (concluding that allegations that plaintiffs' "credit reports were accessed by third parties" sufficiently alleged "concrete injury").

This Court in *Ewing* went on to consider what it expressly acknowledged to be "some dicta in [*Ramirez*]"—namely, the Supreme Court's observation in footnote six that it would likely have rejected an "internal publication" theory[10] offered by the plaintiffs, had that theory not already been forfeited. 24 F.4th at 1153 (citing

---

[10] The "internal publication" theory was that since the inaccurate information was available to employees of TransUnion, even if it had not been disseminated to creditors, Article III standing was satisfied. *Ramirez,* 594 U.S. at 434 n.6.

8

*Ramirez*, 594 U.S. at 434 n.6). But immediately following this digression, this Court squarely held that the plaintiffs had "shown publication here through their evidence of third-party dissemination" and that they therefore "resemble[d] the prevailing subclass in [*Ramirez*], who demonstrated that misleading information about them had been 'disseminated to third parties' and so 'suffered a concrete injury in fact under Article III.'" *Id.* (quoting *Ramirez*, 594 U.S. at 433). Because the Supreme Court in *Ramirez* had not "require[d] those plaintiffs to come forward with additional evidence of publication," this Court in *Ewing* held firm, expressly refusing to adopt any additional requirements that might "erode [*Ramirez*'s] holding that evidence of dissemination to a third party is sufficient to show publication." *Id.* at 1153-54.

In sum, when a consumer's credit report contains inaccurate information that is plainly derogatory, such as a false statement that the consumer has been delinquent on their mortgage, or that a disputed credit line has not been disputed, and such information has been disseminated to a third party creditor, that is sufficient for Article III standing without any further requirements. The Panel's decision concluding otherwise was error, and this Court should grant Plaintiff-Appellant's Petition to correct it.

## CONCLUSION

*Amici* are not aware of any other federal appellate decisions that require the proof of additional facts demanded by the Panel's decision. *Amici* are greatly concerned that the Panel's evidentiary requirements will, in some cases, prevent some consumers from getting their credit reports fixed and obtaining redress for

damages, and in all cases, drive up the costs of credit reporting litigation generally.

For all of the above reasons, *en banc* review should be granted.

Respectfully submitted,

BERGER MONTAGUE PC

Date: August 16, 2024 /s/John G. Albanese
John G. Albanese
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
(612) 594-5999
jalbanese@bm.net

*Attorney for Amici*

CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief is in compliance with Federal Rule of Appellate Procedure 29, and Circuit Rule 29, in that it contains 2,532 words, including footnotes and headings, as counted by Microsoft Word 365's word count feature.

BERGER MONTAGUE PC

Date: August 16, 2024

/s/John G. Albanese
John G. Albanese
1229 Tyler Street NE, Suite 205
Minneapolis MN 55413
(612) 594-5999
jalbanese@bm.net

*Attorney for Amici*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system on August 16, 2024. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

BERGER MONTAGUE PC

Date: August 16, 2024

/s/John G. Albanese
John G. Albanese
1229 Tyler Street NE, Suite 205
Minneapolis MN 55413
(612) 594-5999
jalbanese@bm.net

*Attorney for Amici*